THE TRUSTEES OF THE INTERNAL IMPROVEMENT FUND, APPELLANTS, vs. THE ST. JOHNS RAILWAY COMPANY, RESPONDENT.

1. The Legislature intended that the trust created by the 2d section of the Internal Improvement Act should be subject to, and to some extent controlled by its subsequent provisions.

2. The 29th section of this act reserving to the General Assembly the power to grant alternate sections of swamp and overflowed lands to railroad companies to the extent therein mentioned, operated as a limitation upon the trust and the power of the Trustees.

3. The 13th section of the charter of the St. Johns Railway Company donating alternate sections of swamp and overflowed lands to this company for six miles on each side of its road, harmonizes with the principles and purposes of the act of Congress granting these lands and with the express provisions of the Internal Improvement Act of this State, and does not impair the obligation of any contract between the creditors of the trust fund and the State or Trustees of the Internal Improvement Fund.

4. The power of one Legislature is not limited by the act of an antecedent one, unless the act of the first is of such character as to call into operation a constitutional limitation upon the power of the second. The Internal Improvement Act is not organic law.

Appeal from the Circuit Court for St. Johns county.

The bill alleges the organization of the company in pursuance of the provisions of its charter, the location of its road within the limits prescribed therein; that the company caused maps, plats, and diagrams to be made showing the line of said road, the connections, distances of township, range, or section lines, as required by the seventh section of said act, and designating the odd sections in fractional

sections within six miles on either side of the road, and of the termini thereof, and forwarded and filed with the officer required by law copies thereof. It further alleges the commencement of the work of construction within the time prescribed in its charter, and its continuation up to the time when it was interrupted and stopped by the belligerents in the late war between the States.

That at the time of this interruption the whole road had been graded to within one mile and a quarter of St. Augustine from Tocoi; that the iron for the road had been purchased by the company, and a large portion received at Tocoi and distributed as far as the eleven mile station; and that iron had been continuously laid down from Tocoi for four miles and a half in the direction of St. Augustine; and that the work of buying cross-ties, stringers, and iron was being carried on until after the commencement of the war between the States. That the iron at Tocoi, and a portion of that which had been laid down, was carried away, and an expensive passenger and other cars, depots, houses, turn-tables, and a trestle near the eleven mile station were destroyed by some of the belligerents. That before its work was interrupted and broken up by the operations of the military forces, the company was carrying the United States mails, passengers, and freight from Tocoi to the eleven mile station by rail, partly iron and partly wooden, and thence by other conveyances to St. Augustine; and that but for the operations of the war the road would soon have been completed, and transportation by rail have been furnished the entire distance of fifteen miles to St. Augustine; that in consequence of the disasters caused by the war, and the general prostration of the finances of the country, the company was greatly hindered and delayed in the completion of its road after the war, but as soon as it could partially recover from its losses it recommenced the work of construction of the road, and before the 23d of December, 1871, had

Trustees I. I. Fund v. St. Johns Railway Co.—Statement of Case.

the remaining part of it graded and wooden rails laid down to St. Augustine, so that daily trains were run, carrying mails, passengers, and freight from Tocoi to St. Augustine, partly by steam and partly by horse power. That up to that time the company had been unable to replace the iron which it had lost, but that in the manner before stated it had substantially complied with the meaning and intent of its charter. That as soon as it could be done, in the prostrate condition of the company, iron was procured and laid down on the entire length of the road, new engines and cars purchased, and that the road was thoroughly equipped and in good running order by the        day of        , 1874. That it was not on account of any negligence of the complainant that the road was not completed within the time prescribed in its charter, but because of the secession of the State. That the State in accordance with its settled policy, and in consideration of the greatly increased value which the construction of the St. Johns Railway would give to the adjacent State lands, and also to the property of the citizens of St. Augustine and St. Johns county, granted to said railroad company, for the purpose of aiding in the construction and equipment of its railway, all the rights, powers, and privileges, title and interest, of the State of Florida in the alternate sections of land, embracing the odd sections or fractional sections of land, the adjacent line of which is within six miles on each side, and from the termini of said road, the fee simple title of such land to vest in said company as the work of the road progressed, that is to say, whenever one-sixth of the whole length of the road should be completed, then one-sixth of the land so granted should vest in said company absolutely in fee simple, to be disposed of by sale or otherwise as the company might deem most for the interest thereof, and also provided that for every one-sixth of said road so completed one-sixth of the lands so granted should vest in said company. That by the 8th

534    SUPREME COURT.

Trustees I. I. Fund v. St. Johns Railway Co.—Statement of Case.

section of its act of incorporation the right of way of four hundred feet on each side of said road was also granted to this company to vest in it as fast as the road was continuously graded.

That the right to make such grants as are contained in said charter was reserved in the 29th section of the "internal improvement act;" and that the Legislature had power under said section to grant the alternate sections of the swamp and overflowed lands for six miles on each side of any such road which they might thereafter charter; that the St. Johns Railroad Company had in every respect complied with the provisions of this act in respect to drainage.

That the State has recognized the right of this company to exercise and enjoy the franchises granted in its charter; and that no forfeiture of any right or privilege has ever been claimed or adjudged, but that the State has acquiesced in and confirmed the exercise of the rights and privileges conferred under its charter, by permitting the company to proceed to the full completion of its part of the contract in the complete construction and equipment of its road. That the value of the Internal Improvement Fund is much greater than all of its present liabilities; and that the grant to this company under its charter has increased the value of the even sections belonging to the fund which were before almost valueless. That the company having fulfilled its contract by the building, equipping, and keeping in good running order the said road, and complied with the requirements and consideration mentioned in the act, the right of way, as well as the odd and fractional sections granted in its charter, vested in the company in fee simple.

The bill then charges that the taking and selling these lands by the Trustees of the Internal Improvement Fund for the benefit of that fund was in violation of the charter of the company, of the Constitutions of the United States and State of Florida, by taking private property for public

use without compensation and without due process of law, and prays that the grant of the lands to the company may be decreed to be valid, and that the title to the same has vested in it in fee simple, and for injunction, account, and the payment to the company of the proceeds of such of said lands as had been sold by the Trustees.

The answer, filed March 2, 1876, by the Hon. W. A. Cocke, being solicitor for defendants, does not contradict any of the material allegations of the bill, but admits that the 13th section of the act incorporating the company grants to it all the right, title, and interest of the State of Florida in the lands therein mentioned.

It then alleges that this 13th section is illegal and inoperative, and carries with it no rights to the St. Johns railway for the alternate sections of land claimed in the bill; that these lands had irrevocably passed to the Trustees of the Internal Improvement Fund by the act of January 6, 1855, as a trust fund, to be strictly applied according to the provisions of said act.

It alleges further that the purposes of the trust are fully set forth and defined in the 4th section of said act, and that the lands cannot be given away so as to impair the definite purposes of the trust until it is accomplished. It admits that by the 29th section of this act it does appear that the power was given to the General Assembly to grant alternate sections of the swamp and overflowed lands for six miles on each side of any railroad that may hereafter be chartered, but alleges that this section is in contravention of the great and leading purposes of said act, and not only inconsistent with the trust, but that any construction which would give it the operation prayed for in the bill, would destroy the privileges of the trust, and give to subsequent Legislatures the power of impairing, if not destroying, the purposes of the act. That if the 29th section is capable of bearing the construction put upon it by complainant, yet,

nevertheless, they are not entitled to its provisions under the 30th section, which deprives any company of the benefits of said act failing to grade twenty miles of their road within four years from the filing of their acceptance of its terms, and the defendants deny that the complainant ever did comply with sections 30 and 6 of said act.

The answer then alleges that there are heavy debts resting over the property belonging to the trust fund, and a judgment for a very heavy amount, which it submits is a lien on the fund until paid, and that the lands mentioned in the bill are in the legal custody and control of the Trustees of the Internal Improvement Fund.

The case was submitted upon the bill, answer and exhibits in the court below, which, by its decree, affirmed the title of the company to the right of way and lands mentioned in the bill, and enjoined the defendants, the Trustees of the Internal Improvement Fund, from selling or disposing of said lands, or from interfering in any manner with the company in the use, occupation, or disposal of the same.

From this decree the defendants appealed.

*Geo. P. Raney* for Appellants.

The internal improvement act vested in the Trustees of the Internal Improvement Fund irrevocably all of the swamp and overflowed lands granted the State by the act of September 28, 1850, for the purpose of aiding the construction of the lines of railway and the canal mentioned in the 4th section of the internal improvement act.

No reservation of any right to appropriate any of said lands to any other purpose until after the railroad companies indicated by the provisions of said act should for five consecutive years pay six per cent. on the capital stock paid in and the interest on the bonded debt, and apply the sum of one per cent. yearly to a sinking fund, (sec. 27,) was

JANUARY TERM, 1878.        537

Trustees I. I. Fund v. St. Johns Railway Co.—Argument of Counsel.

made, except that contained in the 29th section of said act. This reservation was a power for the General Assembly to grant to railroad companies subsequently chartered the alternate sections of said lands for six miles on each side of their roads, on the compliance by said companies with the provisions of the internal improvement act as to the manner of constructing the road and drainage.

The manner of constructing the roads is particularly shown by the 6th section of such internal improvement act; and among other requirements, that the gauge should be five feet, the iron weigh not less than sixty pounds per lineal yard, as well as others, which will appear upon reference to said 6th section.

Chap. 734 of Laws of Fla. (Act of 1855) provided that the details of construction specified in said section, except the sixth specification therein, might be modified by the consent and approval of the Trustees of the Internal Improvement Fund, in so far as the companies accepting the provisions of said internal improvement act were concerned.

The pleadings show that there has been no compliance by the appellee with the requirements of said 6th section of the internal improvement law except as to drainage.

These lands having been vested in the Trustees as above stated, no diversion could be made of them for any purpose or upon any terms or conditions other than those stated in the said 29th section, until the juncture contemplated by the 27th section had been reached. The pleadings do not show that any such juncture had been reached, but do show that the fund had become involved, which fact is also shown by the laws of Florida.

The right to have the Internal Improvement Fund applied strictly in accordance with the terms of the internal improvement act, had become a vested right in the trustees of the fund for the benefit of all persons who might be holders

of any bonds endorsed by them and for all creditors of the same, and it was not competent for the Legislature to divert any part of said fund, except as allowed by the 29th section of said act, and any act or law pretending to so do is a nullity to this extent.

Assuming that it was the intention of the charter act of the appellee to permit the appellee to acquire any lands of the fund without complying with the requirements of the internal improvement law, we submit that the said charter act was unconstitutional. Cooley's Con. Lim., 126 ; Fletcher vs. Peck, 6 Cranch, 87; Winter vs. Jones, 10 Ga., 190 ; Chesapeake & O. C. Co. vs. B. & O. R. R. Co., 4 Gill & John., 1.

A compliance with the requirements of the internal improvement law, as to the construction of the road of any company claiming alternate sections under said 29th section, is a condition precedent to the vesting of the title to such lands, and the pleadings show that this condition was never performed, and consequently no title has ever passed from the Trustees or vested in the appellee. Railway Co. vs. Prescott, 16 Wall., 603 ; Comyns vs. Latimer, 2 Fla., 71 ; Jenkins vs. Noel, 3 Stewart, 60 ; U. S. vs. Baisdon, 11 Howard, 85.

The pleadings show that the appellee company did not comply with the requirements of its charter act by completing within five years its road, according to the specifications and requirements of its charter.

The charter act of the appellee does not expressly repeal the 6th or 29th sections of the internal improvement law, and every presumption should be indulged against an intention to repeal any part of said law. The charter act should be construed, if possible, so as not to come under the charge of having been intended to violate vested rights. Erwin vs. Moore, 15 Ga., 351 ; Lee vs. Foreman, 3 Metc., 114 ; Blain vs. Bailey, 25 Ind., 165 ; Cass vs. Dillon, 2 Ohio St., 607.

*James M. Baker* for Appellee.

The St. Johns Railway Company was chartered by act of Legislature passed in 1858. See pamphlet laws, 91. That under the provisions of the 13th section of said act the said railway company are entitled to alternate odd sections lying within six miles on either side of said road and the termini thereof; also the right of way specified in charter. That said charter was a valid contract between the State of Florida and said company, made upon good and sufficient consideration therein expressed. 16 Wallace, 232; 6 Cranch, 137; 4 Wheaton, 518. That the 29th section of the internal improvement act authorized the Legislature of the State to make grants of alternate sections of lands for building railroads not belonging to the system of internal improvements adopted under the said act. See Act.

It is claimed by the Trustees of the Internal Improvement Fund that the said grant to the St. Johns Railway Company was in violation of the internal improvement act, and impaired the obligation of the contract vesting certain lands in them as such Trustees. Cooley on Con., 357.

That said section 29 being a reservation of power to the State, all persons contracting with the State or the Trustees are charged with notice of such reserved power over the fund.

The powers exercised in making said grant were not in violation of or inconsistent with the provisions of said act, but were in furtherance of a well-considered system of internal improvements for the development of the State.

It was understood and agreed in the argument of this case in the court below that no forfeiture of charter by the company would be claimed, and that the road was built and the lands granted were set apart as alleged in the bill, and the case was submitted on bill and answer to save time and secure a hearing before the next term of the Supreme Court.

The only questions submitted to the court below were—first, that the act granting the lands was unconstitutional as impairing the obligations of a contract; second, that the St. Johns Railway was not built in accordance with the provisions and specifications of the internal improvement act.

The 29th section of the act is deemed sufficient answer to the first objection. If the Legislature had reserved the right to make the grant, they had the power to specify the terms and restrictions which would constitute the consideration. One Legislature had no right to limit or restrict the action of a subsequent one in the discharge of a constitutional function or power. Cooley on Con., 125, and note.

If the Legislature of 1858 had the right to make such grant of land for a specified purpose, such as the building of a railroad, they had the right to fix and regulate the restrictions and terms.

If any terms were specified in the reservation of power in the 29th section, the subsequent Legislature had the right to modify and change them, if deemed advisable.

That such change would not interfere with vested rights under the act; the power to make the grant being admitted, the manner, terms, specifications, and considerations were matters solely between the State and the grantees, as they were the only parties interested.

It is contended that no land could vest in this company under said grant under the terms of the internal improvement act until twenty or thirty miles of the road should be completed, and that this road being only fifteen miles long, no land could vest, which, if correct, would defeat the grant. The Legislature, however, in the exercise of its power, authorized the grantees to take on the completion of every two and a half miles or one-sixth of the whole road.

The charter changed the restrictions and specifications of the act of 1855.

The road being short and of no great commercial impor-

tance, the charter only required sufficient weight of iron to transport all the freight and passengers offering between the termini of the road.

The legislative grant in this case left nothing further to be done by the State or its agents; the act itself was the grant, no deed was required. The contract could not be revoked by the State unless for want of consideration; the contract is considered in such cases executed. Potter on Dwarris, 478.

Whether a law is void for repugnancy to the constitution is at all times a question of delicacy which ought seldom, if ever, to be decided in the affirmative in doubtful case. Potter on Dwarris, 65.

JUDGE WHITE, of the Second Circuit, (sitting in the place of Mr. Justice Westcott, disqualified,) delivered the opinion of the court.

There are two questions involved in this case—

*First.* Whether the 13th section of the St. Johns Railway charter granting swamp and overflowed lands to this company is unconstitutional, as impairing the obligation of contracts arising under the internal improvement act of January 6, 1855?

*Second.* Whether the St. Johns Railway was constituted in accordance with the provisions and specifications of the internal improvement act; and, if not, whether the doing of this was a condition precedent upon which the grant to it should take effect?

The lands granted to the company are a portion of those which were granted to the State by act of Congress of September 28, 1850. This act specifies the object and conditions of the grant, and the Supreme Court of the United States, commenting on it, says: " It is not doubted that the grant by the United States to the State, upon conditions,

542        **SUPREME COURT.**

Trustees I. I. Fund v. St. Johns Railway Co.— Opinion of Court.

and the acceptance of the grant by the State, constituted a contract. All the elements of a contract met in the transaction, competent parties, proper subject-matter, sufficient consideration, and consent of minds. This contract was binding upon the State, and could not be violated by its legislation without infringement of the contract. The grant required the State to appropriate the lands granted to the purpose of reclaiming them." McGhee vs. Mathis, 4 Wallace, 155.

From this case we see that it was the opinion of the Supreme Court of the United States that any disposition of the lands for objects and purposes other than those of the grant, and in such a manner as to defeat these, would be a violation of this contract. This leads to the inquiry whether the act of the Legislature consolidating *them* with the lands granted to the State for internal improvement purposes, and vesting them in trust under the second section, was enacted with a view and intention of carrying into effect the contract entered into under the act of Congress. It cannot be supposed that the Legislature by this act intended to violate this contract, but it must be assumed that the contrary was their intention.

By referring to the act of Congress, we find that the object of the grant was to enable the States to *reclaim* these lands for settlement and cultivation, and the means of doing this, as pointed out in the act, was by the use of the proceeds of these lands, or the appropriation of the lands in kind. The only condition annexed to the grant was that they should be applied exclusively, so far as necessary, to the purpose of reclaiming said lands by levees and drains. Wherever these means were not necessary, a full discretion was left to the States in the choice of other means, not inconsistent with the grant, which they might deem most appropriate to carry into effect its object. Some of them might be best reclaimed by means of drains, some by levees,

and some by both combined. But the States in which they were situated were necessarily to be the judges and to have the power of determining the necessity of either, or both modes; or whether the object could be better accomplished to any extent by other methods.

It is true, that the leading object of the Legislature in passing this act seems to have been to provide for and encourage a liberal system of internal improvements in this State, and for this purpose they set apart all of the internal improvement and swamp and overflowed lands acquired by the grant, and declared them to be a separate and distinct fund, to be strictly applied according to the provisions of the act. (Section 1.) For the purpose of assuring a proper application of this fund for the purposes therein declared, they vested these lands in five trustees, by the second section, to be held by them *in trust for the uses and purposes thereinafter provided.* The leading and primary use and purpose thereinafter provided, to which the fund was made applicable, was to aid in the construction of those lines of road and canal mentioned in the 4th section, and which have been held by this court in all of its adjudications of this act to be a State system. The terms, conditions, and manner in which this aid should be extended to roads which might accept its provisions were prescribed in the act. Another use and purpose for which this fund was set apart and to which it was made applicable was that provided in the 16th section. Finally, these lands were to be applied in such manner as might be directed by the Legislature upon the contingencies mentioned in the 27th section. But all of these uses were intended to be subject to the power reserved to the General Assembly in the 29th section of the act to grant alternate sections of the swamp and overflowed lands, for six miles on each side, to such railroads to be thereafter chartered, as they might deem proper.

We have now the grant by Congress, its objects, *and the*

*legislative action and power* over the subject, and we are of opinion that in passing this act, the Legislature intended as one of its main objects to carry into effect the purposes of this grant. If this intention can be collected from the act, it must control its construction. That such was its intention is evident from the 16th section, which provides that " the trustees shall make such arrangements for drainage of swamp and overflowed lands as in their judgment may be most advantageous to the internal improvement fund and the settlement and cultivation of the land."

This is one of the modes of reclaiming these lands pointed out in the act of Congress. This intention is further evident from the 29th section, in which the power to grant alternate sections is reserved to the General Assembly, which is limited to this class of lands granted by Congress, and must be construed in reference to this grant, and as one of the means of reclaiming it.

It is clear from these provisions that the Legislature intended that the trust created by the second section of this act should be subject to, and to some extent controlled by its subsequent provisions.

As further evidence of this we refer to the 28th section, in which the right of way is granted, and to the 15th section, in which the alternate sections of State lands for six miles on each side are granted to the different companies which might thereafter construct portions of the lines of road indicated in the 4th section, " but the title to the same shall not vest in the company except as the road progresses, and not until thirty miles are completed, when the company may sell one-half of the same within said thirty miles, and on the completion of thirty additional miles, then they may sell the balance of their lands remaining unsold in the first thirty miles, and so on for each division of thirty miles until the road is completed." It will be noticed that the grant of the right of way is unconditional ; that of the alternate sec-

tions was to take effect upon the contingencies mentioned in the 15th section. Nothing further was left to be done by the State or the Trustees to vest the title of these lands in the companies; it was a present grant to take effect as the work progressed.

What stronger evidence could be given than that drawn from these sections, that the Legislature intended that the trust created by the 2d section of the act should be subject to, and to some extent controlled by, its subsequent provisions?

If correct in the position that the Legislature intended by this act to execute to some extent the contract arising under the act of Congress, and that they intended that the trust created by the 2d section of the internal improvement act should be subject to, and to some extent controlled by, its subsequent provisions, then the importance of the reservation of the power over this subject in the 29th section becomes more striking and apparent, as a necessary means of more fully carrying into effect the purposes of the grant by Congress.

It must be borne in mind that a very small portion of the lands vested in the Trustees were donated for general internal improvement purposes, not exceeding five hundred thousand acres; much the larger portion, probably nineteen-twentieths of them, was donated under the grant of the swamp and overflowed lands. When this vast domain is considered, much, if not most, of it lying out of the reach and beyond the influence for development of the great and leading works indicated in the 4th section, it would have been singular if some such power had not been reserved. No more efficient mode of reclaiming them could have been devised than that of constructing lines of railroad and canals through them, thus rendering them accessible to settlers, furnishing transportation for their productions, enhancing the value of the adjacent lands, and making these avail-

able for the fund and leading purposes of the trust, which would otherwise be valueless to it ; and as such works producing such results are ordinarily beyond the capacity of individual capital and enterprise, it was a wise provision of the act to reserve the power and authorize the use of these lands for such purposes by granting portions of them to corporations, which, by combination of capital, could more successfully accomplish those objects. Railroads, more than any other modern institution, are considered the great developers of new countries, by hastening their settlement and rapid improvement, and in a State, situated as is a large portion of ours, with its greatly-diver. sified climate and varied productions, but much of it inaccessible for want of transportation, no one can estimate the value which such works would add to these lands and the resulting advantages to the fund, to say nothing of their influence in sustaining the roads, which were the primary objects of the trust. This view of the law is sustained by sound reasoning, and no doubt influenced and controlled the body which devised and adopted the internal improvement act.

The present is the first case in which the reserved power of the Legislature over this fund, under the 29th section of the act, has been brought in question.

It is contended that the Legislature had no power to make the grant to the St. Johns Railway Company under the 13th section of its charter, because a previous Legislature had vested the lands so granted in the Trustees of the Internal Improvement Fund, and that they have become bound to the creditors of this fund by the terms of this contract, and that the 13th section is a diversion of a part of this fund from the purposes of the trust, and is, therefore, inoperative and void, because it impairs the obligation of said contract.

This court, in the case of Gonzalez vs. Sullivan, (reported in this volume) held "that the acceptance of the provisions

of the internal improvement act by those companies constituted such act, its requirements and benefits a portion of their several charters, and that such requirements became a law of their being."

We add that these companies, their creditors and the trustees, acquired all of the rights confirmed by this act, subject to its restrictions and reservations, which formed a part of the law of their contract with the State when they accepted its provisions.

All of the lands vested in the Trustees were pledged to the purposes of the trust, *except* such as the Legislature authorized to be otherwise applied, and these exceptions apply exclusively to the swamp and overflowed lands. These are the lands granted to the St. Johns Railway Company under the 13th section of its charter, and the grant is strictly within the limits and only of the lands named in the 29th section, which reserved the power to the Legislature to make the grant. If they vested in the Trustees, they did so *subject* to this reserved power of the Legislature to dispose of them in the manner and for the purposes mentioned in the 13th section of this charter.

This section is a contract between the State and this company, based upon a valuable consideration which the company has performed on its part, and the trust fund has derived its benefits in the enhanced value of the even sections which *remain* to the fund within the limits of the grant, which was a part of the consideration stipulated in the act.

In the case of Gonzalez vs. Sullivan, the court, in commenting on the case of Bailey vs. The Trustees, (10 Fla.,) say: "A holder of bonds before that time, issued under the third section of the act, sought to enjoin such appropriation of the fund, (to improve the navigation of a river) and the court held that he was entitled to such injunction. The ground of its action was that the measure of the right of the holder of the bond was the act of 1855; that upon the sale of

the bonds therein authorized rights became vested, a con-tract was brought into existence ; that the terms of the law measured its obligation; and that the act appropriating funds for the improvement of a river was a violation of this contract in that it diverted a portion of the funds pledged for the payment of the bond contrary to the terms of the law;" and they add: " That case was authority for the posi-tion that an antecedent bondholder can set aside or enjoin an appropriation of the fund for any purpose to which it was not applicable at the time that his right as a bond-holder attached.   That was the true question in the case, the equity of the bondholder, the *cestui que trust*, was held effec-tive to restrain and limit the power of the Trustees to the terms of the law as it was when his right accrued, and when the obligation of his contract attached."   The law as it stood when the right of the creditor in this case accrued, and when the obligation of his contract attached, declared in express terms " that the alternate sections of the swamp and overflowed lands for six miles on each side may be granted by the General Assembly to such railroad compa-nies, to be hereafter chartered, as they may deem proper." This was but a retention by the Legislature of its original power over the subject to the extent mentioned in the act, and to this extent operated as a limitation upon the trust and the power of the Trustees.   It was notice to the credi-tor of the power therein reserved, was binding upon the Trustees, and entered into and became a part of the condi-tion of the contract under which the bonds were issued and the creditor took them.   They contracted with a view to this reservation and subject to the *exception* of these lands from the funds pledged.   These are " the terms of the law as it was when his right accrued and when the obligation of his contract attached."   It did not in any respect change the character of the trust, or in any other manner limit it.   It but more clearly defined it by pointing out the limitation which

the Legislature intended to place upon it. Thus limited this power cannot be used to impair or defeat the trust, as contended by the appellants, but was intended and may be made to promote its objects by enhancing the value of the alternate sections remaining in the fund, and thus improving the trust property.

In the case of Gleason vs. The Trustees, this court held that it was the *duty* of the Trustees to *improve the trust property*. The court say : " The error of the defence here made by the Trustees is the conception that a contract to improve the trust estate by using a portion of it to render the balance more valuable in the manner authorized by the act ; in other words, using a portion of the fund, or a portion of the land itself, to make the other more advantageous, is a violation of the trust. The construction contended for would render the Trustees powerless to drain one acre of the millions of acres of swamp lands now in their hands, thus preventing their improvement, and would prevent them from carrying out the manifest policy and spirit of the law on the subject. The performance of this contract, (for the drainage of lands) so far as appears from the face of the bill, is no diversion of the trust fund ; it is its simple improvement in a manner authorized by the law of the trust." 15 Fla., 398–9.

So we think that the grant to the St. Johns Railway Company was but carrying out the true spirit and policy of the law on this subject, which we have seen was twofold, to reclaim these lands by granting the alternate sections as authorized by the 29th section, and by the use of this as one means to improve the trust estate in aid of the internal improvement system inaugurated by the act.

It would not be straining the law too far to say that the Legislature also intended by this means to extend to the remote and inaccessible portions of the State the benefit of this class of improvements. It is manifest then that the Leg-

islature intended to dispose of these lands in the various modes pointed out in this act in such a manner as to carry into effect the object of the grant by Congress, and at the same time to provide for the objects of the trust created by this act. To strike out the 16th and 29th sections would render the act obnoxious to the constitutional prohibition to the States forbidding the passing of any law impairing the obligation of contracts; for without these sections the act would be a total diversion of this magnificent fund from the object of the grant by Congress, and an exclusive application of it to another and different purpose from that contemplated in the grant.

By our construction of the internal improvement act, its various provisions are made to harmonize with each other and with the act of Congress, and each is made to stand and take effect.

It is in harmony also with the several decisions of this court on the different questions which have arisen under it. For these reasons we think the 13th section of the St. Johns Railway charter does not conflict, but harmonizes with the principles and purposes of the act of Congress granting these lands, and with the express provisions of the internal improvement act. It interferes with no vested right, nor does it impair the obligation of any contract between the State and United States, or the Trustees and creditors of the fund.

We come next to the consideration of the *second question*, whether the St. Johns railway was constructed in compliance with the provisions and specifications of the internal improvement act, and if not, whether the doing of *this* was a condition precedent upon which the grant to this company should take effect.

It is contended that a compliance with the provisions of the 29th section, as to the construction of the road, is a con-

dition precedent to the vesting of the title of these lands in the company.

The provision of the 29th section, as to the manner of the construction of the roads therein authorized, refers to the sixth specification of the sixth section of the same act, which regulates the gauge of the *different railroads* which were to constitute the general system under this act; the other specifications of this section were modified by the 1st section of the act of 14th of December, 1855. There is no question in this case as to drainage, the bill alleging that the company had complied with the provisions of the internal improvement act on this subject, and this is conceded by the appellants.

The only question is as to the guage of the road, and the appellants contend that the pleadings show that this condition was never performed, and that consequently no title has ever passed from the Trustees or vested in the company. But it will be apparent, upon examination of the 13th section of the act incorporating this company, that the investiture of the title to the lands therein granted was not made to depend upon any such condition, but was made to take effect upon the completion of one-sixth of the work, and so on for every one-sixth as the work progressed to its final completion. This is the only condition named in its charter upon which the grant should vest in the company, and upon the performance of this condition it became executed in the company.

But it is alleged that the charter act of this company does not expressly repeal the 6th and 29th sections of the internal improvement law, and that " every presumption should be indulged against an intention to repeal any part of said law."

We do not think the charter act of this company has any such effect, in so far as the 6th section of the internal improvement law was applicable to and binding upon the com-

panies which accepted its provisions. So far as these are concerned, as decided by this court, it became a part of " the law of their being."

But the act incorporating this company did not bring it within the system provided for in the internal improvement act; it was not required to accept its provisions, and had it accepted them, this would not have made it a part of the system without some clause in its charter or special act authorizing it; it is outside of and independent of the system, and the internal improvement act is no part of its organic law, nor is it bound by any of its provisions. Its rights and powers are derived solely from its charter.

The power of the Legislature reserved in the 29th section being an original power not parted with, is not and could not be limited by the 6th section so as to prevent any future Legislature from exercising its co-equal power over the same subject, unless rights had become vested arising under contract which brought into operation some constitutional limitation upon the exercise of such power by a future Legislature. This is a principle well established by all the authorities on this subject. See Cooley's Con., 125–6–7, note 1, 126.

In the case of Gonzalez vs. Sullivan, this court used this language: " The court here simply say that the Legislature had the right to designate some objects of improvement to be constructed first, and to postpone others. While this may be true of this Legislature, it is also true of a subsequent Legislature that its powers were not limited by the power of the first, unless the act of the first was of such character as called into operation a constitutional limitation, and something more than a simple antecedent exercise of legislative power stood in the way of the exercise of the powers of the subsequent one. The internal improvement act is not organic law, and the power of one Legislature is no greater than another. Where the power of the subsequent one is limited, it results from the fact that the act of the first is of

such character that the organic law renders it inviolable through constitutional limitations covering the subject."

The specifications of the 6th section of the internal improvement act are the terms of a contract between the State on the one part and the companies which accepted it on the other, and between these parties these specifications were binding; and it was only upon a compliance with this and other provisions of the act that these companies were authorized to construct their roads and issue their bonds.

The reason why these companies were required to comply with the sixth specification of the 6th section in the matter of the gauge of their roads is given in this specification. It says: "The gauge of the different railroads shall be uniformly five feet, and connected continuously, so that cars or trains of cars can pass on all the routes *indicated* without changing freight." What routes were *indicated?* Those mentioned in the 4th section undoubtedly; and the reason of this requirement was to so construct the roads which were to form the general system that the cars or trains of each should pass over the roads of the others; and the subsequent portion of this specification makes it "the duty of the different railroad companies to adopt a uniform tariff for transportation of passengers and for hauling the freight in the cars of another company, and no discrimination shall be made by one company against the freight or passengers of another company."

The reason of this requirement is not applicable to the St. Johns Railway, which is no part of the *system*, but is remote from and disconnected with it. It is difficult to perceive how or in what manner the general system can be injured, or the rights of its creditors affected, by allowing a different gauge to another road with which it has not and cannot have a connection.

If the St. Johns Railway Company had been required to conform its gauge to that of the roads composing the gen-

eral system, the effect upon the fund and the rights of its creditors would have been the same; it would not have added to, or diminished the fund, or affected their rights, or made them different in any manner from what they are under the grant in the 13th section without this requirement.

So far then as these creditors are concerned, their rights are not affected, nor is the obligation of the contract between the State or Trustees and them impaired by the grant in the 13th section of the charter of this company; and this being so, it was competent for the Legislature to make the grant therein without requiring on their part a compliance with the 6th section of the internal improvement act.

But it is said the grant failed because this company did not complete its road within the time required by its charter. There is no forfeiture in the act of the grant upon the failure of the company to complete its road within the time prescribed in its charter, neither has there been any forfeiture of its franchises claimed or adjudged; but, as before stated, the title was to vest in fee simple in the company upon the completion of one-sixth of the road, and so on for every one-sixth until the whole road should have been completed, and this having been done, the grant became absolute in the company.

The decree of the court below must be affirmed.